Argued October 13, reversed December 14, 1972

LENRICH ASSOCIATES, *Appellant, v.*
HEYDA ET AL, *Respondents.*

504 P2d 112

*Kenneth E. Roberts, Jr.,* Portland, argued the cause for appellant. With him on the briefs were Souther, Spaulding, Kinsey, Williamson & Schwabe, Donald Joe Willis and Ridgway K. Foley, Jr.

*William S. Lebov* and *Stephen B. Murdock,* of Legal Aid Service, Portland, argued the cause and filed a brief for respondents.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE, HOLMAN, HOWELL and BRYSON, Justices.

McALLISTER, J.

Plaintiff is the owner of a shopping center on the east side of Portland known as "Mall 205." Defendants are members of a religious organization known as the International Society of Krishna Consciousness. On a number of occasions defendants, without plaintiff's permission, engaged in various activities in Mall 205, including chanting, marching and offering for sale a magazine about their religion. On isolated occasions the defendants also played a guitar and a makeshift drum and burned and sold incense. Plaintiff sought an injunction to prevent defendants from engaging in all those activities on plaintiff's property. The trial court decreed that defendants must be allowed to enter the common areas of the mall for the purpose of communicating ideas, to discuss the tenets and nature of their religion and to distribute and sell their magazines and other printed matter relating to their religion. Plaintiff appeals and contends that its property rights guaranteed under the Fifth and Fourteenth Amendments of the Constitution of the United States are infringed by the decree.

The following description of Mall 205 is adapted from the statement of facts in appellant's brief, which was adopted by respondents. The shopping center consists of two large department stores, White Front Department Store, located at one end of the complex, and Montgomery Ward, located at the other end, which together constitute approximately 65 per cent of the total floor space, and 39 relatively small specialty shops and vacant space for approximately 10 more shops. All of the shops are included in and covered by a single ground-level building. Nine of the shops are food and beverage establishments. Except

for one restaurant and bar establishment, which has an outside entrance for after-hours traffic, customers enter the small shops solely from the interior mall.

The central mall is an enclosed covered corridor approximately 415 feet in length and 35 feet in width. At each end are two courts with a fountain and planter, connecting the central mall with Montgomery Ward and White Front. Access to the interior mall is restricted to two open entryways from Montgomery Ward and White Front, and three sets of swinging doors between the center's parking facilities and the mall. All entrances are closed and locked after normal business hours.

The interior mall is a climate-controlled environment, with background music, designed to create a pleasant business atmosphere. The interior mall includes, in addition to the walkway portions, two water fountains and two planters, together with approximately a dozen park-like benches and a directory assistance and a telephone kiosk. The mall is also the site of a candy shop, and space is available for three additional commercial kiosks.

Although each specialty shop has its own leased area which is separated from the other tenants with walls, many shops do not physically separate their premises from the interior mall; that is, that portion of the shop which fronts the interior mall is entirely open. In all cases, those establishments which do have doors keep them physically propped open during business hours. At the south end of the mall is a restaurant complex with some restaurant seating open to the interior mall.

Most Mall 205 customers arrive and depart by automobile and park in the center's privately owned

parking facilities and walk to and from such facilities via sidewalks owned by the plaintiff.

After this case was decided by the trial court the Supreme Court decided *Lloyd Corp., Ltd. v. Tanner,* 407 US 551, 92 S Ct 2219, 33 L Ed 2d 131 (1972). Plaintiff contends that *Tanner* controls the disposition of this case and requires reversal. If so, the other issues raised by the appeal need not be considered.

In *Tanner* it was held that the owners of the Lloyd Center in Portland had a right to prohibit the distribution of political handbills in the privately-owned interior mall. The federal district court had held that the Lloyd Center was the "functional equivalent of a public business district," and that the prohibition of the distribution of handbills in the mall was a violation of First Amendment rights of free expression. 308 FS 128 (1970). The Court of Appeals for the Ninth Circuit affirmed. 446 F2d 545 (1971). Those courts relied on the reasoning of the Supreme Court in *Marsh v. Alabama,* 326 US 501, 66 S Ct 276, 90 L Ed 265 (1946) and *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.,* 391 US 308, 88 S Ct 1601, 20 L Ed 2d 603 (1968). The Supreme Court held, however, that *Marsh* and *Logan Valley* were distinguishable and that the rationale of those cases did not prevent the owners of Lloyd Center from prohibiting handbilling on their premises.

We have carefully examined the agreed statement of facts and the attached exhibits and find no significant distinctions between the facts in this case and the facts in *Lloyd Corp. v. Tanner.* If there are any such distinctions the defendants have not called our attention to them. Although the defendants repeatedly contend that plaintiff's mall is the "functional equiva-

lent" of a public business district, which was the basis of the holding of the federal district court in *Tanner,* the Supreme Court indicated that this was not the critical question. 33 L Ed 2d at 139-140. The Supreme Court held that private owners of shopping centers could prohibit free speech activities on their premises, in spite of a general invitation to the public to enter for business-related purposes, unless some additional factor was present. In *Marsh* the additional factor was the private ownership of an entire town; in *Logan Valley* it was the direct relationship between the message of the picketers and the operation of one of the businesses in the shopping center. The Court found no such additional factor in *Tanner,* and Mall 205 presents, if anything, a less compelling case than does Lloyd Center. It is smaller and public access is more limited. We find nothing in the circumstances of this case which would justify a different result than that reached in *Tanner.*

Defendants argue that this court can give the individual rights of expression and religious freedom greater protection than that provided under *Tanner* by reliance on the appropriate provisions of the state constitution.[1] We are, of course, free to enforce the guarantees of our state constitution so as to allow greater freedom or to give greater protection to individual liberties than are given under the federal Bill of Rights as interpreted by the United States Supreme Court. That power was recently exercised in *Steven-*

---

[1] Art. I, § 3: "No law shall in any case whatever control the free exercise, and enjoyment of religeous (sic) opinions, or interfere with the rights of conscience."

Art. I, § 8: "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

*son v. Holzman,* 254 Or 94, 103-104, 458 P2d 414, 419 (1969) and in *State v. Brown,* 262 Or 442, 497 P2d 1191 (1972). In *State v. Childs,* 252 Or 91, 99, 447 P2d 304, 308 (1968) we said:

> "We realize that we could construe the freedom of expression provision of the Oregon Constitution, Art. I, § 8, as providing greater freedom of expression than that of the First Amendment of the United States Constitution. * * * "

This case, however, involves more than the extent of individual rights under our constitution. The issue raised by plaintiff is whether its rights under the Constitution of the United States as the owner of private property are outweighed by defendants' First Amendment rights of free speech. If that is the question decided by *Tanner* we are bound by that decision and must apply it in this case. It is necessary, therefore, to determine the *ratio decidendi* of the *Tanner* decision. In writing for the majority of the court in *Lloyd Corp. v. Tanner,* supra, Mr. Justice Powell stated the issue in these words:

> "This case presents the question reserved by the Court in Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc. 391 US 308, 20 L Ed 2d 603, 88 S Ct 1601 (1968), as to the right of a privately owned shopping center to prohibit the distribution of handbills on its property when the handbilling is unrelated to the shopping center's operations. * * * We granted certiorari to consider petitioner's contention that the decision below violates rights of private property protected by the Fifth and Fourteenth Amendments. * * * " 407 US at 552-553.

Throughout Mr. Justice Powell's opinion are recurring statements making it clear that the court was engaged in weighing the First Amendment rights of the

respondents against the Fifth and Fourteenth Amendment rights of private property owners. Those statements include the following:

"* * * It would be an unwarranted infringement of property rights to require them to yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist. Such an accommodation would diminish property rights without significantly enhancing the asserted right of free speech. * * *

"* * * The Due Process Clauses of the Fifth and Fourteenth Amendments are also relevant to this case. They provide that 'no person shall . . . be deprived of life, liberty or property, without due process of law.' There is the further proscription in the Fifth Amendment against the taking of 'private property . . . for public use, without just compensation.'
* * * * *

"We do say that the Fifth and Fourteenth Amendment rights of private property owners, as well as the First Amendment rights of all citizens, must be respected and protected. The Framers of the Constitution certainly did not think these fundamental rights of a free society are incompatible with each other. There may be situations where accommodations between them, and the drawing of lines to assure due protection of both, are not easy. But on the facts presented in this case, the answer is clear." 407 US at 567-570.

There was no disagreement between the majority and the minority of the court in *Tanner* about the issue which the court was deciding. Mr. Justice Marshall in his dissenting opinion tersely stated the issue as follows:

"The question presented by this case is whether one of the incidents of petitioner's private ownership of the Lloyd Center is the power to exclude

certain forms of speech from its property. * * * "
407 US at 572-573.

Later in his opinion Mr. Justice Marshall also said:

> "We must remember that it is a balance that
> we are striking—a balance between the freedom
> to speak, a freedom that is given a preferred place
> in our hierarchy of values, and the freedom of a
> private property-owner to control his property.
> * * * " 407 US at 580.

The issue in this case, as in *Tanner*, is the extent to
which plaintiff's rights as a property owner can be in-
fringed in favor of the rights of the public to free
speech and freedom of expression. In the absence of
any significant factual differences the decision in
*Tanner* is controlling and requires that this case be
reversed.

It is so ordered.

DENECKE, J., specially concurring.

The majority holds that we cannot give the indi-
vidual rights of expression and religious freedom
greater protection by reliance on rights under the ap-
propriate provisions of the Oregon Constitution than
those provided under *Lloyd Corp., Ltd. v. Tanner*,
407 US 551, 92 S Ct 2219, 33 L Ed2d 131 (1972). The
majority decision is based upon the opinion that *Tan-
ner* decides that the shopping center owner has
property rights which are protected by the Fifth and
Fourteenth Amendments of the Federal Constitu-
tion and these rights would be violated if the defend-
ants were permitted to continue their activity on plain-
tiff's property.

I agree with Mr. Justice McALLISTER's statements
in the majority opinion that the language used by Mr.
Justice Powell seems to indicate that Lloyd's property

rights are being accorded the federal constitutional protection of the Fifth and Fourteenth Amendments. Despite this language, I am of the opinion that this cannot be the basis for the decision of the United States Supreme Court. I reach this conclusion because such a basis would be a drastic departure from what I thought to be established constitutional law and Mr. Justice Powell makes no mention of any change in direction in interpreting the Fifth and Fourteenth Amendments.

The Fifth and Fourteenth Amendments prohibit the government from depriving a person of his property without due process of law, and, in the case of the Fourteenth Amendment, denying equal protection. The Fifth Amendment applies to the federal government and the Fourteenth Amendment to the states. From the Civil Rights Cases, 109 US 3, 3 S Ct 18, 27 L Ed 835 (1883), to the present the Fourteenth Amendment has been interpreted to prohibit conduct by the state but to leave conduct by private persons untouched.

The issue in *Moose Lodge No. 107 v. Irvis,* 407 US 163, 92 S Ct 1965, 32 L Ed2d 627 (1972), decided 10 days before *Lloyd Corp., Ltd. v. Tanner,* supra (407 US 551), was whether the conduct was state conduct or private conduct. The Moose Lodge refused to serve liquor to a Negro guest. The guest filed suit in federal district court for an injunction, contending that the lodge was able to serve liquor only because of a license issued by the State of Pennsylvania; therefore, the conduct of the lodge was state action. A federal court granted relief; however, the United States Supreme Court held there was no state action, therefore, the Fourteenth Amendment was not violated.

In *Tanner* the Court points out that the First

Amendment, through the Fourteenth, safeguards the rights of free speech "by limitations on state action, not on action by the owner of private property * * *." 407 US at 567. In *Tanner* the Lloyd Corporation's security guards, commissioned by the city, threatened to arrest Tanner and his associates unless they ceased distributing their handbills within the Lloyd's center. The Court did not state whether this constituted state action against Tanner which would invoke the protection of the First and Fourteenth Amendments. I would think it would be.

The question I have about *Tanner,* however, is what state action was there against the Lloyd Corporation so as to wrap Lloyd's property rights in the protection of the Fourteenth Amendment. Tanner and his associates were a threat to the sanctity of Lloyd's property interests but there is no suggestion in the statement of the facts or the law that any state action threatened Lloyd's property rights.

As stated, the United States Supreme Court opinion seems to place Lloyd's property rights under the protection of the Fifth Amendment, as well as the Fourteenth. The due process clause of the Fifth Amendment is a restriction on the federal government. In *Tanner* the federal district court, a branch of the federal government, enjoined Lloyd Corporation from interfering with Tanner's right to distribute handbills on Lloyd's property. Court action has been held to be sufficient state action to invoke the Fourteenth Amendment protections. In *Shelley v. Kraemer,* 334 US 1, 68 S Ct 836, 92 L Ed 1161, 3 ALR2d 441 (1947), the state courts enjoined violation of restrictive racial covenants in conveyances. The Court held that judicial action was sufficient state action to invoke the protection of the Fourteenth Amendment.

The United States Supreme Court did not intimate that the action of the district court was the necessary federal action. If the district court decree were deemed sufficient federal action I would consider such a decision to be a significant extension of *Shelley v. Kraemer*, supra (334 US 1), and would expect such an extension to be extensively commented upon in the opinion.

In addition, I was of the opinion that in order to constitute a deprivation of property which was invalid under the Fifth and Fourteenth Amendments there had to be a "taking" of property. This is not present in *Tanner*.

If the majority's interpretation of *Tanner* is correct, that decision logically would appear to greatly restrict the rights of states and their subdivisions to regulate the use of property.

First Amendment rights are regarded as the ultimate in the scale of constitutional rights. The majority interprets *Tanner* to hold that these top-rated First Amendment rights must yield to a constitutionally protected right to have one's private, but publicly used, property free from peaceful handbilling. Under such a rationale what will be the future fate of a zoning ordinance prohibiting the use of all the property in a city for use as an automobile wrecking yard where the purpose of the ordinance was to protect the esthetic sense of the community? In *Oregon City v. Hartke*, 240 Or 35, 400 P2d 255 (1965), we held this to be valid. It seems apparent, however, that the infringement on property rights is much greater in the zoning case than the infringement on the Lloyd Corporation's property. The protection of the esthetic sense of the community,

while laudable, in my opinion, is "not in the same league" with the protection of the right of free speech.

I do not believe *Tanner* has to be interpreted in this manner. *Tanner,* supra (407 US 551), *Marsh v. Alabama,* 326 US 501, 66 S Ct 276, 90 L Ed 265 (1946), and *Amalgamated Food Employees v. Logan Valley Plaza,* 391 US 308, 88 S Ct 1601, 20 L Ed2d 603 (1968), all agree that persons are not entitled to exercise First Amendment rights on private property which is in no way open to the public; for example, on private residential property surrounded by a high fence with large signs stating, "Keep Out." No suggestion was made in the cases prior to *Tanner* that such a property owner was protected against intruders by the Fifth and Fourteenth Amendments. I construe those opinions to quite clearly state that the property owner was protected by the state law of property, particularly the state property law that provides that a property owner has the right to be free from trespassers.

I believe *Tanner* can most logically be interpreted as an extension of this kind of reasoning. The invitation by the property owner to the public to come in and shop does not sufficiently alter the character of the property so as to deprive the property owner of its rights under the state property law to oust persons it does not want on the premises although such persons come on the property endeavoring to exercise First Amendment rights.

I conclude that the *Tanner* case does not hold that Lloyd's property rights were protected by the Federal Constitution. I am, therefore, not foreclosed by that decision from considering what protection is afforded the defendants' rights under §§ 3, 8, Art I, of the Ore-

gon Constitution.① (Freedom of exercise of religion and speech.)

These two sections commence, "No law shall * * *." Similarly, § 9, Art I, prohibiting unreasonable searches or seizures commences, "No law shall, * * *." We have interpreted this prohibition to apply to not only the legislative branch but to the judiciary and executive as well. *State v. McDaniel*, 115 Or 187, 209, 231 P 965, 237 P 373 (1925); *Crouch v. Central Labor Council*, 134 Or 612, 622, 293 P 729 (1930).

I am uncertain whether there is "a law" restraining defendants' alleged Oregon constitutional rights of free speech and exercise of religion. I will assume there is. Nevertheless, I am of the opinion that under the facts in this case, defendants' rights under the Oregon Constitution have not been violated. My reasoning is similar to that expressed by Mr. Justice White, dissenting in *Logan Valley Plaza* except that I am of the opinion that the facts in this case are stronger for the property owner than they were in *Logan Valley Plaza*. The public was only invited for a limited purpose, browsing or shopping. The owner did not invite persons who entered for a purpose that had no connection with shopping. On the other side, there was a public area in close proximity where the defendants could exercise their religion and speech and communicate to most of the patrons of the mall and others in the neighborhood.

---

① "No law shall in any case whatever control the free exercise, and enjoyment of religious opinions, or interfere with the rights of conscience.

"* * * * *

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

HOLMAN, J., concurring.

It is impossible to read *Lloyd Corp., Ltd. v. Tanner*[①] and be certain whether the majority opinion is correct in interpreting it as engaging in a balancing process between constitutionally protected Fifth and Fourteenth Amendment property rights on the one hand and the First Amendment right of free speech on the other, or whether *Tanner* should be viewed, as the dissenting and the other concurring opinion view it, as referring to the Fifth and Fourteenth Amendments only as emblematic of the importance of property rights generally. *Tanner* seems to read as the majority of the court interprets it. However, no one can be certain of the intention of the Supreme Court of the United States until the opinion is clarified.

I prefer not to guess and it is unnecessary for me to do so. If *Tanner* was merely an evaluation of nonconstitutionally protected property rights as opposed to the claimed First Amendment right of free speech, I would come to the same conclusion in this case under the provisions of the Oregon Constitution as the Supreme Court of the United States came to in *Tanner* under the United States Constitution. The location of the First Amendment activity was completely enclosed within the four walls and the roof of a building which was entirely devoted to business use. The defendants could have effectively carried out their First Amendment activities outside the entrances to the building, and their necessity for coming within plaintiff's building was non-existent.

O'CONNELL, C. J., dissenting.

I would affirm the decree of the trial court on the ground that the mall area in this case is essentially a

---

[①] 407 US 551, 92 S Ct 2219, 33 L Ed 2d 131 (1972).

public place and that the defendants are entitled to the protection of Art. I, § 8 of the Oregon Constitution.[1]

The majority reads *Lloyd Corporation v. Tanner,* 407 US 551, 92 S Ct 2219, 33 L Ed2d 131 (1972) as foreclosing our consideration of our own constitution in this case. This conclusion is forced, it is felt, because *Lloyd Corporation* is treated as holding that the plaintiff in that case was protected under the Fourteenth Amendment against a deprivation of its property rights by the kind of interference created by the defendant Tanner. Although the Court in the *Lloyd* case spoke of weighing the interests of the parties under the First and Fourteenth Amendments, the Fourteenth Amendment could not possibly have any application in the *Lloyd* case because even if the interference by Tanner could be regarded as a "taking" of the plaintiff's private property, there was no participation by the state or the federal government in the alleged deprivation. The only possible governmental involvement directed toward the deprivation of Lloyd Corporation's property interest was the decree of the Federal District Court restraining Lloyd from interference with Tanner's First Amendment rights. To say that the entry of a court decree constitutes governmental involvement would be patently untenable because it would mean that in every case in which the decree adversely affects property rights of a party to the litigation, he could use the decree as the predicate for asserting a constitutional claim.[2]

---

[1] I would employ the reasoning of the Federal District Court of Oregon in Tanner v. Lloyd Corporation, 308 F Supp 128 (D Or 1970), and of the dissent in Lloyd Corporation v. Tanner, 407 US 551, 92 S Ct 2219, 33 L Ed2d 131 at 144 (1972).

[2] I recognize that Shelley v. Kraemer, 334 US 1, 68 S Ct 836,

With the removal of the Fourteenth Amendment rationale from *Lloyd Corporation v. Tanner, supra,* the case stands only for the proposition that Tanner was not entitled to the protection of the First Amendment. On this reasoning, we would not be precluded from affording Tanner greater protection under our constitution than the U.S. Supreme Court saw fit to afford him under the Federal Constitution.

92 L Ed 1161, 3 ALR2d 441 (1947) treated the decree of the Court as constituting state involvement in a case involving the Equal Protection Clause of the Fourteenth Amendment. However, the Supreme Court has not extended the idea of state action developed in Shelley v. Kraemer to other cases, even in the area of equal protection. Certainly it is not to be expected that the principle would be extended to the due process cases.